613 F.2d 180
 JAMES, Roland W., Fitzsimons, James R., Brahs, Dwight M.,
Sacco, Frank, and Maffeo, John H., on behalf of
themselves and their respective classes,
Plaintiffs-Appellants,
v.
BALL, Germain H., Conovaloff, Alex M., Rousseau, Bill,
Smith, Leo C., Williams, John M., Jr., Hurley, Thomas P.,
Schrader, William P., Hoopes, John S., Fitch, W. Larkin, and
Finley, Thomas J., in their capacity as members of the Board
of Dir., Salt River Project Agricultural Improvement and
Power District, and Abel, Karl F., in his capacity as
President of the Salt River Project Agricultural Improvement
and Power District, Defendants-Appellees.
 No. 76-1918.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 12, 1979.
Rehearing Denied Feb. 6, 1980.
 
 Bruce E. Meyerson, Phoenix, Ariz., for plaintiffs-appellants.
 Jon L. Kyl, Jennings, Strouss & Salmon, Phoenix, Ariz., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before CHOY and KENNEDY, Circuit Judges, and HALL,* District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 This appeal, from an action commenced in the District of Arizona, challenges the constitutionality of Arizona statutes which provide that voting in elections for directors of the Salt River Project Agricultural and Improvement and Power District (the District) is limited to landowners, with votes essentially apportioned to owned acreage. The appellants are citizens of Arizona residing within the geographical boundaries of the District. Each appellant either rents land or owns less than one acre of land within the District and is thus excluded from the voting franchise. The action was brought under 42 U.S.C. § 1983. The Arizona statutes challenged are Ariz.Rev.Stat. §§ 45-909 and 45-983.[1] The district court found those state statutes are consistent with the requirements of the fourteenth amendment and granted the District's motion for summary judgment. We reverse that determination. The district court also denied certification of the suit as a class action, and as to that aspect of the case we affirm.
 
 I. Facts
 
 2
 Under the Reclamation Act of 1902, the Federal Government and the State of Arizona established a joint project for storage and delivery of water in the Salt River Valley. The project was limited to agricultural lands within the physical boundaries of the project.
 
 
 3
 The Federal Government built water storage and distribution facilities and hydroelectric facilities for the project. The Reclamation Act required that properties benefited by the project bear the costs of construction, and the Salt River Valley Waters Users' Association was organized, under Arizona corporate law, to pay those costs. Only persons holding project land could belong to the Association; only Association members could receive water from the project. The Association's obligations became pro rata liens on the lands of Association members.
 
 
 4
 By the 1930's the Association found the costs of financing project facilities overly burdensome. To alleviate this problem, the Salt River Project Agricultural Improvement and Power District was established. The District qualified as a municipal corporation. The District's bonds were eligible for tax-exempt status so that interest costs for the project were substantially reduced.
 
 
 5
 Under a 1937 agreement between the Association and the District, the Association agreed to continue to perform all obligations connected with the operation and maintenance of the project on behalf of the District. The Association also agreed to give title to project facilities to the District, subject only to whatever rights the federal government retained under the original transfer to the Association. The District agreed to provide whatever capital and operating funds the Association needed to operate project facilities. Pursuant to the 1937 agreement, the District now operates the water storage and distribution facilities. In addition the District generates electric power, and today the District is the second largest utility in Arizona. Ninety-eight percent of the District's total revenues are derived from electricity operations.
 
 
 6
 Arizona statutes mandate the voting system for the District. The District is subdivided into ten electoral divisions, each of which elects one director and three council members. A president and vice-president are elected at large. Qualified electors have votes for these offices apportioned according to the amount of land they hold. In addition, qualified voters elect two at-large directors (to become four in 1980) on a per-person voting basis. The twelve-member Board of Directors and thirty-member Council administer the District.[2]
 
 II. Equal Protection Claim
 
 7
 Since its decision in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court has repeatedly applied the principle of one person-one vote, and it has invalidated restrictions on voter eligibility in many different types of elections. See Hill v. Stone, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). The Court has on two occasions struck down laws that limit voting to landowners. City of Phoenix v. Kolodziejski, supra; Cipriano v. City of Houma, supra. In Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), however, the Supreme Court made an exception to Reynolds and upheld a state law which permitted only landowners to vote in an election to choose the directors of a water district. Because Salyer, and the companion case of Associated Enterprises, Inc. v. Toltec Watershed Improvement District, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973) (per curiam), are the only cases since Reynolds which permit this type of voter restriction, the arguments of the parties here focus largely on the applicability of Salyer to the case before us.
 
 
 8
 In Salyer, plaintiffs challenged the voting system for a water district that allowed only landowners to vote, with votes apportioned according to the assessed valuation of the land owned. The Supreme Court, after examining the nature of the service provided by the particular district, concluded that "by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group," 410 U.S. at 728, 93 S.Ct. at 1229, the water storage district fell within an exception to Reynolds.
 
 
 9
 Critical to an understanding of Salyer is the factual setting of the case. The water district consisted of 193,000 acres, all of it agricultural land, 85% Farmed by one or another of four corporations. It had a total population of 77 residents. Assessments against landowners were the sole means of paying expenses of the District, so that landowners as a class bore the entire financial burden. Moreover, the reason for the District's existence and continued operation was to provide water for farming, Id. at 728, 93 S.Ct. 1224, and, as stressed by the Court, the primary effect of its operations was upon agricultural lands. Although the District had authority to undertake certain flood control activities, the Court found these powers were incident to the exercise of its primary functions of water storage and distribution. Id. at 728 n.8, 93 S.Ct. 1224 n.8. The Court specifically noted that the District provided "no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." Id. at 728-29, 93 S.Ct. at 1230.
 
 
 10
 The case at hand is quite different. Although at one time the Salt River District did bear some similarities to the district in Salyer, today the size and nature of the projects of the District and the effect of its operations on all of the residents of Arizona are far more extensive than those of the district in Salyer. The Salt River District is engaged in far-reaching electric power operations. It is the second largest electric utility in the State of Arizona and services nearly a quarter million persons. The utility owns five hydroelectric facilities and four steam generating plants; it is a partial owner of three coal-fired steam generating facilities; and it is a participant in the Palo Verde nuclear plant.
 
 
 11
 The water operations of the Salt River District are also significantly more diverse than those in Salyer. The District is not concerned solely with providing water for agriculture. Its formerly rural area encompasses today eight Arizona municipalities, including major portions of Phoenix. About 25% Of the total water delivered by the District goes to these cities for municipal uses, and an additional 15% Of the district water is delivered for other nonagricultural uses, such as schools, parks, playgrounds, and subdivision purposes. In view of the broad scope and impact of its activities, the Salt River District cannot be characterized as having a special limited purpose.
 
 
 12
 Further, the activities of this District do not disproportionately affect landowners. Unlike Salyer, nearly 40% Of the water delivered by the District is used and paid for in a manner unrelated to agriculture or landownership. As to the electric operations, nearly all the citizens in the District are vitally affected in ways unrelated to ownership of real property. As the Supreme Court stated in Cipriano v. City of Houma, 395 U.S. 701, 705, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969) (per curiam), "the operation of the utility systems gas, water, and electric affects virtually every resident of the city." It is true that there are $290,000,000 of general obligation bonds outstanding that are secured by a lien on District lands. However, all the bonds have been serviced out of earnings of the District; and since 1973, all capital improvements have been financed entirely from bonds secured solely by a pledge of revenues. The earnings of the District have been sufficient to permit it to issue a total of $600,000,000 worth of revenue bonds, and these are all Junior to the general obligation bonds. Ninety-eight percent of the District's substantial revenues are produced by its electric utility operations. Thus, unlike Salyer, the financial burden of operating the District does not fall entirely or even primarily on landowners; it falls instead on the purchasers of electricity.
 
 
 13
 Appellees argue, nevertheless, that the operations of the District do have a disproportionate effect on landowners. Noting the profits from the sale of electricity are used to defray irrigation expenses, they compare the District to a private company which permits only stockholders to vote for the board of directors. The comparison fails, however. This is a public entity, not a private company. The District is a political subdivision of the State of Arizona with the legal status of a municipality. Ariz.Const., art. 13, § 7. It is entitled to all the immunities and exemptions granted municipalities. Moreover, the scale of the District's operations simply does not permit the interpretation that the electric utility is a side venture that the District dabbles in to pick up a little extra money in order to benefit the landowners. The operation of the utility has taken on independent significance. In view of the magnitude of the electric utility operations and the large percentage of the water services which are used and paid for in a manner unrelated to land ownership, it would elevate form over substance to characterize the District as functioning solely for the benefit of landowners.
 
 
 14
 The Salyer Court, in analyzing whether the Tulare District had a "special limited purpose," noted that the District did not exercise "normal governmental authority." 410 U.S. at 729, 93 S.Ct. 1224, 35 L.Ed.2d 659. See Hadley v. Junior College District, 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Avery v. Midland County, 390 U.S. 474, 485, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Appellees cite this language and argue that in this case neither the water nor the electric power activities of the District are governmental in nature. We cannot agree. While Salyer can be understood as holding that the provision of water for agriculture is not a governmental function, the water services provided by the Salt River District are not confined to agricultural uses.
 
 
 15
 With respect to the electric utility operations, appellees rely on Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) as support for the proposition that the provision of electricity is not a governmental function. The question before us, however, is altogether different from the issue confronted in Jackson. There the issue was whether or not a privately owned utility was so closely regulated by the state that its actions were state actions under the fourteenth amendment. Salyer did not hold that the fourteenth amendment did not apply to the water district. The case assumed there was state action and dealt with the question of the requirements of the fourteenth amendment in that situation. The issue is not whether the Salt River District is a state entity, but whether, having made the decision to create the entity and provide for the election of its directors, the state can deny the electoral franchise to citizens whose economic interest and natural environment are vitally affected by the entity's operations.[3]
 
 
 16
 Salyer suggests that for purposes of this type of inquiry, the operation of an electric utility is governmental in nature. In reaching its conclusion that the Tulare District did not exercise normal governmental authority, the Court specifically noted that the District provided "no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." 410 U.S. at 728-29, 93 S.Ct. at 1230. This conclusion is further confirmed by Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam). There the Court concluded that the operation of a municipal utility system affected such a large percentage of the population that it was unconstitutional to permit only property taxpayers to vote in elections called to approve the issuance of revenue bonds by the utility.[4]
 
 
 17
 In this Court the District makes repeated reference to statutory and decisional authority indicating that the District's principal purpose and obligation is to provide water to the lands within it. If this legal proposition is correct, then the district will no doubt comply with it or be subject to corrective actions by the courts or the Arizona legislature. It is not, however, an argument that justifies trying to skew the electoral system as an indirect way to produce that result. The electric utility operations of the District are so substantial in scope and are so closely interwoven with the water delivery functions of the District that it is not a special limited purpose district whose operations have a disproportionate effect on landowners as a class. The principle of one person-one vote cannot be abridged in these circumstances.
 
 
 18
 Implicit in appellees' contention lies a legal assumption that is quite incorrect. It is, specifically, that disproportionate representation may be used to prevent electors who have a direct and substantial interest in a government entity's operations from out-voting certain other electors who own land that constitutes part of the security for the entity's financial structure. Disproportionate electoral representation, under this unstated but implicit rationale, serves as a safety device to protect property interests or expectations of landowners. We find no holding or intimation in any controlling Supreme Court decision that can support such a view. The rationale for departing from the one person-one vote standard is altogether different. It is that under certain conditions, of most narrow dimension, there may exist a state created entity, limited to operations with little effect on the general electorate and a substantially disproportionate effect on the interests of a discrete group permitted to vote. Salyer, 410 U.S. at 728-30, 93 S.Ct. 1224. If, on the other hand, the operations of a state entity affect a diverse group of citizens, the franchise cannot be restricted to exclude those who have an interest in the election. Hill v. Stone, 421 U.S. 289, 95 S.Ct. 1637 (1975); City of Phoenix v. Kolodziejski, 399 U.S. 204, 209, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam).
 
 III. Class Action Certification
 
 19
 Appellants argue that the district court erred in refusing to certify the suit as a class action. Appellants' complaint, filed on July 28, 1975, stated that it was brought on behalf of the named plaintiffs and their respective classes under rule 23(b)(2) of the Federal Rules of Civil Procedure. A motion for certification was not filed, however, until February 24, 1976, when appellants filed their motion for summary judgment. The district court denied certification. We affirm its ruling in this respect.
 
 
 20
 The determination of class action status rests within the sound discretion of the district court. Montgomery v. Rumsfeld, 572 F.2d 250, 255 (9th Cir. 1978); Hornreich v. Plant Industries, Inc., 535 F.2d 550, 552 (9th Cir. 1976). Having reviewed the record, we cannot say that the district court abused its discretion. Here, the relief sought will, as a practical matter, produce the same result as formal class-wide relief. See Craft v. Memphis Light, Gas & Water Division, 534 F.2d 684, 686 (6th Cir. 1976), Aff'd on other grounds, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1977); Ihrke v. Northern States Power Co., 459 F.2d 566, 572, 93 S.Ct. 66, 34 L.Ed.2d 72 (8th Cir.), vacated and remanded to dismiss as moot, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972). Accord, Carter v. Butz, 479 F.2d 1084, 1089 (3rd Cir.), Cert. denied, 414 U.S. 1094, 94 S.Ct. 727, 38 L.Ed.2d 552 (1973). See also Mead v. Parker, 464 F.2d 1108, 1112 (9th Cir. 1972) (dictum). But see Fujishima v. Board of Educ., 460 F.2d 1355, 1360 (7th Cir. 1972). We are not unmindful of the benefits of a class action, See 3B Moore's Federal Practice P 23.40(3) at 23-296 n.9, but we conclude that in this case they would not be significant.
 
 
 21
 REVERSED in part, AFFIRMED in part.
 
 PEIRSON M. HALL, District Judge, dissenting:
 
 22
 Upon a study of the majority opinion and a close reexamination of the briefs of the parties, I cannot escape the conclusion that what the court is holding is essentially that the plaintiffs, solely because they are users, are entitled to participate in all of the benefits as owners in the management and the operation of the defendant District. I fail to find anything in any of the cases cited or any of those upon separate research to indicate any "constitutional protection" to the plaintiffs who are simply owners and renters of property and have no interest or obligation whatsoever, substantial or otherwise, in repaying the hundreds of millions of dollars which have been borrowed and are now owed by the District to enable the district to give the plaintiffs the water and electricity which the plaintiffs use. The sale of electric power by the District was authorized by Congress in 1906, 34 Stats. 117: 43 U.S.C. § 522, when it was necessary to or would help in development of the project. The plaintiffs cannot make a claim that development and sale of power was not, and is not, necessary for the water. The majority opinion disregards this preemption of power.
 
 
 23
 The nonagricultural owners, who are residents and state voters, are given the equal right to vote as the agricultural owners, proportionate to the acreage ownership. But the plaintiffs seek here to make the owner of one-eighth of an acre (50 X 100 lot) And the renter who owns nothing, the same right to participate in the management of the hundred million dollar business of defendants as the landowner of any 500 acres of agricultural land whose land has stood as security throughout the history of building the project and whose present share of lien for indebtedness is more than $3,000 an acre or a total of one and a half million dollars. The development of this project began 119 years ago in 1860. It became government operated after the Federal Reclamation Act of 1902. 32 Stats. 388: 43 U.S.C. § 371. To apply the same one man one vote to the Southern California Edison Company, for instance, would mean that user could have the same rights in management as the owner of $1,000,000 worth of stock.
 
 
 24
 Not only is there no provision in the Constitution, due process, equal protection or otherwise which suggests such a far-out result, but that is the logical result of the plaintiffs' contention.
 
 
 25
 The plaintiffs allege no property Damage of any kind, no personal Inconvenience, no personal Injuries, nor Anything which is measurable in the equivalent of money. In fact, their claim is founded, according to their Opening Brief, page 1, upon the claims that the "District's electric and water operations have an Important and substantial Effect and impact on their lives such that they are entitled to participate in district elections on an equal basis with all qualified electors regardless of property ownership." They ultimately actually seek a mandatory injunction, the equitable remedy which requires that the damage be Great and Irreparable.
 
 
 26
 The case, in my judgment, falls squarely within the holding of the Supreme Court in Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) and the Associated Enterprises, Inc. v. Toltec Watershed Improvement District, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973).
 
 
 27
 I will not attempt to improve upon the discussions concerning Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990 (1970); Hadley v. Junior College District of Metropolitan Kansas City, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Avery v. Midland Company, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); and Hill v. Stone, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) which are done by the Supreme Court in the Salyer case.
 
 
 28
 The furnishing of electricity for public use, whether done by a city or otherwise, Is a proprietary business and not a municipal or state business. It is "vested with public interest" only in the sense that it can be regulated by the state, Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), which it is. It is not naturally for the protection of use of all persons. It is conducted for those persons who use it and pay for it. Thus, it is unlike a street, a road, a sewer, a gutter, street lights and so forth. Moreover, the granting of this right of a customer to the control of the property to which one has contributed nothing Merely because he is a customer raises the question as to whether or not that in itself is in violation of the clause prohibiting the taking of private property for public use without just compensation as well as the due process clause.
 
 
 29
 The plaintiffs (Plaintiffs' Reply Brief, page 16) claim that the defendants are attempting to rely upon "undue deference to legislative schemes conceived of in days Now gone by." Yet they claim to depend upon the legislative schemes set forth in the Constitution which have been adopted in "days gone by," more than 125 years before the defendants came into existence.
 
 
 30
 A detailed discussion of the controlling authorities in the case is as follows:
 
 I. Equal Protection Claim
 A. Applicability of Salyer Test
 
 31
 Appellants challenge the voter qualification requirements for election of District officials, claiming that these requirements violate the equal protection clause of the fourteenth amendment by invidiously discriminating against them and persons similarly situated who own less than one acre of real property.[1]
 
 
 32
 In Salyer Land Co. v. Tulare Water District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), plaintiff challenged the voting system for a water district that allowed only landowners to vote, with votes apportioned according to the assessed valuation of the land owned. Tracing the development of equal protection analysis of apportionment and voter qualifications in local elections, the Supreme Court observed that in cases invoking a rigid one person, one vote standard, the local entities involved exercised "general governmental power"[2] or performed "important governmental functions."[3] Id. at 727, 93 S.Ct. 1224. By contrast, the water storage district in Salyer, "although vested with some typical governmental powers, ha(d) relatively limited authority." Its primary purpose was simply to provide for the acquisition, storage, and distribution of water within the district. It provided "no other general public services" such as schools, fire or police protection, buses, or roads. Moreover, the Court noted, the district's actions "disproportionately affect landowners," thus supporting limitation of the franchise to them. Id. at 728-29, 93 S.Ct. 1224.
 
 
 33
 By distinguishing the Tulare Water Storage District from the government bodies involved in previous representation decisions, the Court explicitly denied the applicability of strict one person, one vote equal protection analysis to such special districts. See Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 68, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). The Court based this distinction largely upon its decisions in Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) and Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).
 
 
 34
 Avery involved an equal protection challenge to the method of selecting Midland County, Texas, officials that gave disproportionate influence to voters in thinly populated districts. The Court stated the general rule:
 
 
 35
 When the State apportions its legislature, it must have due regard for the Equal Protection Clause. Similarly, when the State delegates lawmaking power to local government and provides for the election of local officials . . . it must insure that those qualified to vote have the right to an equally effective voice in the election process.
 
 
 36
 390 U.S. at 480, 88 S.Ct. at 1118. The county argued that this rule should not extend to the county governing board because the board performed administrative rather than legislative functions. The Court noted, however, that the board possessed the "law-making power" "to make a large number of decisions having a broad range of impact on all the citizens of the county." The board determined tax rates, equalized assessments, issued bonds, and allocated the county's funds with broad statutory authority. The board also made "both long-term judgments about the way Midland County should develop whether industry should be solicited, roads improved, recreation facilities built, and land set aside for schools and immediate choices among competing needs." Id. at 483, 88 S.Ct. at 1120. Given these broad powers, the Court concluded that the general rule should apply to the county board. Id. at 484-85, 88 S.Ct. 1114.
 
 
 37
 The county also argued that the extra influence of the thinly populated districts was justified because the county officers' work "disproportionately concern(ed)" rural areas. Id. at 483, 88 S.Ct. 1114. Because the board possessed authority to make numerous decisions affecting all of the county's citizens, the Court did not decide whether this claim, if true, would support apportionment "in ways which give greater influence to the citizens most affected . . . ." Id. at 484, 88 S.Ct. at 1120. Instead, the Court summarized its decision:
 
 
 38
 We hold today only that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having General governmental powers over the entire geographic area served by the body.
 
 
 39
 This Court is aware of the immense pressures facing units of local government, and of the greatly varying problems with which they must deal. The Constitution does not require that a uniform straitjacket bind citizens in (designing) mechanisms of local government suitable for local needs and efficient in solving local problems. . . .
 
 
 40
 . . . Our decision today is only that the Constitution imposes one ground rule for the development of arrangements of local government: a requirement that units with General governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population.
 
 
 41
 Id. at 484-86, 88 S.Ct. at 1120-1121. (emphasis added).
 
 
 42
 Thus, Avery recognized the necessity for an escape from the "straitjacket" application of equal protection requirements when dealing with local government units lacking general governmental powers. This contemplated exception did not require the alternative justification for disproportionate voting rights argued in that case: that the exercise of the county officers' powers had a disproportionate impact upon particular citizens.
 
 
 43
 The Court similarly decided Hadley, involving an equal protection challenge to apportionment that diluted plaintiffs' votes for school district trustees. Though the Court opined that an exception to the strict application of equal protection requirements would be observed where a local body's functions were "far removed from normal governmental activities And . . . disproportionately affect different groups," 397 U.S. at 56, 90 S.Ct. at 795 (emphasis added), its analysis demonstrates that strict one person, one vote requirements will not be imposed when the first of these elements is absent. The Court stated:
 
 
 44
 Appellants . . . argue that the junior college trustees exercised General governmental powers over the entire district and that under Avery the State was thus required to apportion the trustees according to population on an equal basis, as far as practicable. Appellants argue that . . . the trustees can levy and collect taxes, issue bonds . . . , hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college . . . . We feel that these powers, while not fully as broad as those (in Avery), certainly show that the trustees performed Important governmental functions (which) have sufficient impact throughout the district to justify the conclusion that . . . Avery should also be applied here.
 
 
 45
 . . . (W)e see nothing in the present case that indicates that the activities of (the) trustees fit in (the Avery exception). Education has traditionally been a vital government function, and these trustees . . . are governmental officials in every relevant sense of that term.
 
 
 46
 Id. at 53-54, 56, 90 S.Ct. at 794-795 (emphasis added). Thus the Court concluded that the exception enunciated in Avery was inapplicable solely because the officials in Hadley possessed vital and traditional governmental powers. Indeed, its conjunctive inclusion of the fact that these powers had an effect "throughout the district" appears as a prerequisite to application of the strict equal protection requirements of Avery, not to the availability of an exception from them.
 
 
 47
 Salyer reinforces this emphasis on whether the local body possesses "general governmental powers" and performs "important governmental functions." The Salyer court explicitly relied upon Hadley and Avery in fashioning its exception to the strict one person, one vote standard. And although the Court noted that the Tulare Water Storage District also had a disproportionate impact on landowners, its reference to this fact in "not only, but also" fashion underscored its primary reliance upon the fact that the district lacked general governmental powers. I conclude that Salyer 's reference to disproportionate effect was not meant to expand the constitutional requirements of Avery and Hadley ; the critical inquiry remains focused on whether the local body performs traditional general governmental functions. See Salyer, 410 U.S. at 727, 90 S.Ct. 791.
 
 
 48
 The Salt River District does not perform traditional general governmental functions. The legislature has defined the District's purpose as securing water necessary to improve agricultural land. Ariz.Rev.Stat. § 45-903. See Uhlmann v. Wren, 97 Ariz. 366, 374, 401 P.2d 113, 124 (1965). The District's powers are incidental to that task. Local 266 v. Salt River Project Agricultural Improvement & Power District, 78 Ariz. 30, 43, 275 P.2d 393, 402 (1954). This limited role does not entail the exercise of general governmental powers.
 
 
 49
 Moreover, though some municipalities furnish water and electric service, these functions are not traditionally governmental services. In another context, the Supreme Court has noted that "the supplying of utility service is not traditionally the exclusive prerogative of the State" and is not "traditionally associated with sovereignty." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974). Cf. National League of Cities v. Usery, 426 U.S. 833, 854 n. 18, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). And the Arizona Supreme Court has described the Salt River District as having business and economic rather than governmental purposes. Local 266, 78 Ariz. at 43, 275 P.2d at 402.
 
 
 50
 Finally, even if some publicly owned utilities can be compared to vital governmental services, this District is not such a utility. The Arizona Supreme Court has written of the District:
 
 
 51
 Most municipal corporations are owned by the public and managed by public officials. . . . Such is not the case here. . . . The public does not own the District. A governmental entity such as a city or town does not manage or benefit from the profits of this District. Instead the owners are private landholders. The profits from the sale of electricity are used to defray the expense in irrigating these private lands for personal profit. The public interest is merely that of consumers of its product, for which they pay. . . . The District does not function to "serve the whole people" but rather the District operates for the benefit of these "inhabitants of the district" who are private owners.
 
 
 52
 Local 266, 78 Ariz. at 44, 275 P.2d at 402-03. (emphasis added).
 
 
 53
 In short, the District does not perform functions akin to those of general governmental bodies. Accordingly, the Salyer test and not the strict one person, one vote standard of equal protection is applicable in evaluating the District's voter qualification requirements.
 
 
 54
 The District's disproportionate impact upon District landowners strengthens our conclusion that the Salyer test should be employed here. Although the District's policies affect electrical consumers both within and without the District's geographical area as well as landowners within the District, both the legislative purpose and practical effect of the District's activities disproportionately concern the landowners.
 
 
 55
 The Arizona legislature created the District to benefit landowners in the District. See Uhlmann, 97 Ariz. at 374, 401 P.2d at 118-19; Local 266, 78 Ariz. at 43, 275 P.2d at 402-03. For example, the District may sell surplus water and power to those outside the District in order "(t)o reduce the cost of irrigation, drainage and power to the owners of the lands in the district . . . ." Ariz.Rev.Stat. § 45-903(A)(7). Accordingly, revenues from electrical operations have been used to subsidize water functions. The parties characterize this subsidy to District landowners as equivalent in amount to dividends paid to common stockholders in electric utility companies. The parties' concept of the District's electric operations as a form of income for District landowners underscores the District's purpose to benefit District landowners.
 
 
 56
 Just as landowners within the District benefit disproportionately from successful District operations, so too financial reverses of the District disproportionately affect them. Arizona state law provides that bonds issued by the District create liens upon the real property within the District. Ariz.Rev.Stat. § 45-1047(A). And a state statute specifically provides for raising District revenues by taxing the landowners in the District. Ariz.Rev.Stat. § 45-1014(B). Thus, District financial losses have a disproportionate effect on landowners. This potential liability is particularly significant since the Supreme Court in Salyer based its finding of disproportionate effect largely on the fact that Tulare Water District charges constituted a lien upon land within the district. 410 U.S. at 729, 93 S.Ct. 1224.
 
 
 57
 I conclude that the District's actions disproportionately affect District landowners as a group in terms of District purposes, its successful operations, and the liabilities it may create. Thus, whether Salyer is read as emphasizing possession of general governmental powers, as we think proper, or as warranting consideration of the proportionality of effect as well, the challenge to the District's electoral system must be evaluated according to the standards set forth in that decision.
 
 
 58
 B. Acceptability of District's Voting System
 
 In Salyer, the Supreme Court wrote:
 
 59
 Even though appellants derive no benefit from the (strict one person, one vote) cases, they are, of course, entitled to have their equal protection claim assessed to determine whether the State's decision to deny the franchise to residents of the district while granting it to landowners was "wholly irrelevant to achievement of the regulation's objectives," Kotch v. River Port Pilot Comm'rs (Commissioners), 330 U.S. 552, 556, 67 S.Ct. 910, 91 L.Ed. 1093 (1947).
 
 
 60
 410 U.S. at 730, 93 S.Ct. 1224, 1231. I find that the Salt River District's voting scheme is not wholly irrelevant to the legislative objectives in creating the District.
 
 
 61
 In providing for the creation of the District, the Arizona legislature intended to assist landowners in irrigating their land. See Uhlmann, 97 Ariz. at 374, 401 P.2d at 118-19; Local 266, 78 Ariz. at 43, 275 P.2d at 402-03; Ariz.Rev.Stat. § 45-903. Vesting voting control in those landowners, thereby allowing them to control the agency designed to benefit them, is clearly not irrelevant to that legislative objective.
 
 
 62
 Moreover, in Salyer, the Supreme Court found that the California legislature "could quite reasonably have concluded" that landowners should be given control of the Tulare district because the district's liabilities would fall upon the landowners in the form of liens upon their lands. 410 U.S. at 730, 93 S.Ct. 1224. Potential liabilities of the Salt River District also fall upon the District landowners as liens and tax assessments upon the land. Ariz.Rev.Stat. §§ 45-1047(A), 45-1014(B). The Arizona legislature, therefore, could similarly have reasonably concluded that the same landowners responsible for the District's potential liabilities should have voting control of the District.
 
 
 63
 Appellants respond that all persons who use District water or electricity are interested in District policies. But as the Supreme Court wrote in Salyer :
 
 
 64
 No doubt residents within the district may be affected by its activities. But this argument proves too much. Since assessments imposed by the district become a cost of doing business for those who farm within it, and that cost must ultimately be passed along to the consumers of the produce, food shoppers in far away metropolitan areas are to some extent likewise "affected" by the activities of the district. Constitutional adjudication cannot rest on any such "house that Jack built" foundation, however.
 
 
 65
 410 U.S. at 730-31, 93 S.Ct. at 1231.
 
 
 66
 I conclude that the District's voting system is not wholly irrelevant to the legislature's objectives in creating the District. Accordingly, the system does not violate the equal protection provisions of the fourteenth amendment.[4]
 
 II. Irrebuttable Presumption Claim
 
 67
 Appellants additionally claim that the District's voting system impermissibly creates two irrebuttable presumptions: that only landowners are qualified to participate in District elections, and that individual interests in District matters are affected by the size of land holdings.
 
 
 68
 The Supreme Court has indicated that at times determination of eligibility for public benefits must be made on a case-by-case basis because generalized rules of eligibility inadequately reflect variations within administratively defined classes. See, e. g., Vlandis v. Kline, 412 U.S. 441, 452, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). In the instant case, however, the underlying basis of appellants' claim is not that individualized resolution of voter qualification is needed to reflect differences in voters' interests. Instead, appellants argue that the present voting system deals unfairly with the entire class of small landowners and renters. Irrebuttable presumption analysis is not well suited for such claims.
 
 
 69
 Moreover, within the context of Supreme Court decisions dealing with irrebuttable presumptions, the presumptions embodied in the District's voting system are acceptable. In Matthews v. Lucas, 427 U.S. 495, 509, 96 S.Ct. 2755, 2764 (1976), the Supreme Court instructed that
 
 
 70
 presumptions in aid of administrative functions, though they may approximate, rather than precisely mirror, the results that case-by-case adjudication would show, are permissible under the Fifth Amendment, so long as that lack of precise equivalence does not exceed the bounds of substantiality tolerated by the applicable level of scrutiny.
 
 
 71
 See Weinberger v. Salfi, 422 U.S. 749, 784, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Because we concluded earlier that the District's voting system meets the standard of Salyer, the "applicable level of scrutiny" in the instant case, the presumptions implicit within that system are not impermissible. Indeed, the Supreme Court's conclusion in Salyer that a voting system similar to the instant scheme was constitutional implies that the Arizona legislature may make precisely the kind of presumptions necessarily underlying such voting systems.
 
 III. Class Action Certification
 
 72
 Appellants argue finally that the district court erred in refusing to certify the suit as a class action. The determination of class action status rests within the sound discretion of the district court. Montgomery v. Rumsfeld, 572 F.2d 250, 255 (9th Cir. 1978); Hornreich v. Plant Industries, Inc., 535 F.2d 550, 552 (9th Cir. 1976). Having reviewed the record, I cannot say that the district court abused its discretion. Moreover, given my rejection of appellants' claim that the voting statutes are unconstitutional on their face, the denial of class certification, even if improper, could not have infringed the rights of plaintiffs or members of the purported class.
 
 
 73
 I would affirm the lower court in all respects.
 
 
 
 *
 Honorable Peirson Hall, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 Section 45-909 provides:
 No person shall be entitled to vote at any election held under the provisions of this chapter unless he possesses all the qualifications required of electors for state officers under the general elections laws, and is the owner of record of real property located within the boundaries of the district as of sixty days preceding a district election, and on which he has been assessed for county taxes . . . .
 Section 45-983 provides:
 (E)ach landowner possessing the qualifications of an elector shall be entitled to cast one vote at all elections . . . for each acre of land within the district owned by him.
 . . . (E)ach landowner possessing the qualifications of an elector who owns less than one acre of land within the district shall be entitled to a fractional vote . . . equal to the fraction of an acre owned by such elector.
 After the district court rendered its decision, Ariz.Rev.Stat. §§ 45-909 & 45-983 were amended to read as quoted above. In reviewing the decision of the district court, we must look to the statute as it presently reads, not as it read at the time the district court rendered its decision. Fusari v. Steinberg, 419 U.S. 379, 387, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975).
 
 
 [2]
 The 1976 amendments to the statute added the at-large directors and fractional votes. Previously all voting was on a per-acre basis with a one-acre threshold requirement
 
 
 [3]
 In Niedner v. Salt River Project Agricultural Improvement & Power District, 121 Ariz. 331, 590 P.2d 447 (1979), the Arizona Supreme Court held that the District's termination of an employee did not constitute state action implicating the fourteenth amendment. In the present case appellants do not challenge an action of the District. Rather, they contend that the Arizona statutes mandating the voting scheme of the District violate the fourteenth amendment. There can be no doubt that the enactment of those state statutes by the state government constitutes state action. Accordingly, we need not determine now if we would agree with the Arizona Supreme Court's holding that the District's acts do not involve state action
 
 
 [4]
 Subsequent to Jackson, the Supreme Court has cited and relied on Cipriano with no indication that its holding has been undercut by Jackson. Hill v. Stone, 421 U.S. 289, 296, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975)
 
 
 [1]
 The district court granted summary judgment in favor of the District. Summary judgment may be granted " 'only where there is no genuine issue of any material fact or where viewing the evidence . . . in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law.' " Caplan v. Roberts, 506 F.2d 1039, 1042 (9th Cir. 1974). See Fed.R.Civ.P. 56
 Here the parties have stipulated to the facts. Such stipulations conclusively establish the material facts they contain. United States v. Huston, 547 F.2d 104, 107 (9th Cir. 1976). Our task, then, is to determine whether the district court reached the proper legal conclusion in granting summary judgment.
 
 
 [2]
 E. g., Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969)
 
 
 [3]
 E. g., Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Kramer v. Union School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969)
 
 
 [4]
 Appellants suggest that corporations are unconstitutionally denied the right to vote in District elections. I conclude below, § IV Infra, that the District court did not abuse its discretion in refusing class certification. Because the plaintiffs are all noncorporate individuals, "the (corporate) claim of these petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." Warth v. Seldin, 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). See Construction Industry Association of Sonoma County v. City of Petaluma, 522 F.2d 897, 904 (9th Cir. 1975), Cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). I therefore do not consider this contention