1338

Maria MENDOZA, Individually and on behalf of Stephen Mendoza, a Minor; Theresa Trujillo, Individually and on behalf of Albert Trujillo, Joe Trujillo, and David Trujillo, Minors; Alberto Sanchez, Individually and on behalf of Jaime Sanchez, Ana Celis Sanchez, John Sanchez, Ernest Sanchez, George Sanchez, and Betty Sanchez, Minors; and on behalf of all others similarly situated, Plaintiffs-Appellants,

and

Julia O. Flores, Billie Gutierrez, Theresa Medina, Betty M. Granillo, Carol Cruz-Popkin, Barney Paul Popkin, Carmen P. Urrutia, Manuel Alvarado, Carolyn Hackworth, Gloria Hagler, Johnny Randolph-Kelly, Thelma B. Manriquez, Aldolfo A. Suarez, Nat Washington II, Ralph O. Gomez, Juan Brito, Marcia Almeda, Emilia Talamantez, Ellen Lee Esperanza Silva, Antonette Romo, Ronald Q. Huerta, and Lupe Montano, Plaintiffs-Objectors-Appellants,

v.

UNITED STATES of America.
Plaintiff-Intervenor-Appellee,

v.

TUCSON SCHOOL DISTRICT NUMBER 1; The Board of Education, Tucson School District Number 1; Leba Wine, Soleng Tom, Mitchell Vavich, Helen Haffley, and Katie Dusenberry, Individually and as members, Board of Education, Tucson School District Number 1; Thomas Lee, Individually and as Superintendent of Tucson School District Number 1, Defendants-Appellees.

No. 78–3352.

United States Court of Appeals,
Ninth Circuit.

June 27, 1980.

As Amended July 9, 1980.

Rehearing Denied Aug. 11, 1980.

Armand Salese, Tucson, Ariz. (argued), and Neil P. Miller, Tucson, Ariz., on brief, for plaintiffs-objectors-appellants.

John R. Moore, Washington, D. C., for plaintiff-intervenor-appellee.

J. Wm. Brammer, Jr., Tucson, Ariz., argued, for defendants-appellees; William J. Maledon, Phoenix, Ariz., John C. Richardson, Edmund D. Kahn, Tucson, Ariz., Morris J. Baller, San Francisco, Cal., on brief.

Before CHOY and SNEED, Circuit Judges, and EAST,* District Judge.

EAST, District Judge.

The plaintiff-objector-appellant Alberto Sanchez, appearing individually and on behalf of his above-named minors, appeals the District Court's orders entered on August 11, 1978, which approved a submitted plan of desegregation, and August 31, 1978, which approved the settlement arrangement for desegregation of the Tucson School District No. 1. He also appeals the District Court's order of August 11, 1978, which denied the certification of a subclass and various other discovery and post-August 1, 1978 orders of the District Court. We affirm each of the orders appealed from.

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

In this class action school desegregation appeal, certain members of the minority class, including Sanchez, were dissatisfied with part of the remedy negotiated by attorneys for the class, the United States, and the school officials. Sanchez was allowed to retain separate counsel and participate, although with a minimal amount of preparation time, in hearings on the School District's desegregation plan and the class action settlement. Sanchez also raises issues concerning discovery, notice, and negotiation of attorneys' fees.

I. *FACTS*

In May of 1974, a school desegregation action was commenced against the Tucson Unified School District No. 1 by Black elementary and junior high school students (Fisher plaintiffs). That case is now on appeal in the consolidated case, No. 79–3378. Several months later, a separate action was filed on behalf of the District's Mexican-American elementary, junior high, and high school students (Mendoza plaintiffs), here on appeal. In late 1975, the Fisher and Mendoza plaintiffs were certified as class representatives for these Black and Mexican-American classes, respectively. These two causes were consolidated in the District Court for hearing and disposition.

Sidney L. Sutton, et al., a group of white parents opposed to busing, entered as intervenor-defendants in the *Fisher* action in March, 1975.[1] In December, 1976, the United States was permitted to intervene as a plaintiff in both actions.

The *Mendoza* amended complaint consisted of seven counts, alleging (1) maintenance of a tri-ethnic segregated school system; (2) discriminatory tracking; (3) inferior curric-

ula and facilities for minorities; (4) discrimination in the hot-lunch program; (5) discrimination in special education programs; (6) failure to take into account linguistic differences; and (7) lack of bilingual notices. Prior to trial, counts 2, 5, and 6 were stayed and severed based upon HEW's approval of the District's compliance plan to remedy these problems; and counts 3, 4, and 7 were dismissed pursuant to stipulation by class counsel.

After substantial discovery, a consolidated trial of the *Fisher* and *Mendoza* actions was held in January, 1977. On June 5, 1978, the District Court issued its joint decision, finding that the School District had failed to dismantle its former dual school system for Blacks and non-Blacks, and had continued since 1954 to discriminate against Black elementary and junior high school students. The Court found no such dual school system had existed with respect to Mexican-American students, nor did any continuing system-wide practice of intentional discrimination occur. The Court concluded that nine schools suffered current effects of the past intentionally segregative acts of the School District, and ordered the District to prepare a desegregation plan with respect to these nine schools.

Post-trial motions were filed by the Fisher and Mendoza plaintiffs, joined by the United States as an intervenor, to amend the findings and conclusions, and a hearing was held on June 28, 1978. Before a ruling on these motions, plaintiffs and the School District informed the Court that they were in the process of discussing a mutually acceptable plan for desegregation of the nine schools, as well as resolution of the other pending issues. Although the Court withheld submission on these motions, it none-

---

1. Sutton is an intervenor in the *Fisher* case only, District Court No. 74–90, and appeals a later order in that case in consolidated appeal *Fisher v. Tucson Unified School, District No. 1*, 625 F.2d 834 (9th Cir. 1980), decided today. However, Sutton has no standing to participate in the present appeal because he was not a party to the *Mendoza* action, District Court No. 74–204, or this

appeal. Alberto Sanchez, appellant here, is a party only to the *Mendoza* case, and his appeal is properly understood as an appeal only of the *Mendoza* case. Thus, Sutton's attempt to raise additional substantive objections to the August 31st settlement order by a brief filed in this appeal does not place those issues properly before this Court.

theless ordered the District to submit its proposed plan for desegregation by July 17, 1978. The order further instructed the District to consult with its residents, and the plaintiffs' class members, in order to minimize objections to the plan. Accordingly, the District held a number of hearings and meetings, both for the affected parents and for the District's residents at large. At these meetings, the District presented desegregation options and solicited questions and comments. This process culminated with the District timely filing its plan for the nine schools on July 17, 1978.[2] The District Court scheduled a hearing on the plan for August 8, 1978, requiring that written objections be submitted by August 4.

On August 4, 1978, the attorneys reported to the District Court that their discussions had been fruitful: a settlement proposal on all remaining issues in the lawsuits was ready for the Court's consideration. The District Court scheduled a settlement hearing for August 24, 1978, and ordered a proposed form of notice be prepared. It did not disturb the upcoming August 8th hearing on the desegregation plan.

The stipulation of settlement adopted the District's nine-school desegregation plan, and included provisions for immediate integration of three additional schools. It required the District in cooperation with parents to examine future assignment policies at several other elementary and junior high schools, and to eliminate discrimination in faculty assignments, employee training, and in policies on testing and discipline. Also included were provisions for program improvements, regular District progress reports, oversight, and procedural details.

With respect to the lawsuit, the settlement provided for dismissal of all remaining counts (numbers 2–7) in the Mendoza

complaint, and the parties agreed that there would be no further attacks on the District Court's June 5th order, nor on the desegregation plan or the settlement. The settlement also provided for $500,000 in attorneys' fees for class counsel. The settlement was concurred in by attorneys for the District, the Fisher class, the Mendoza class, and the United States Department of Justice.

Meanwhile Sanchez took exception to part of the proposed desegregation plan. Specifically he objected to a provision which called for the closure of three of the nine affected schools, believing that it unfairly burdened portions of the Mexican-American class. Sanchez was also dissatisfied with class counsel's acquiescence in the closure of the three schools, and on July 27, 1978, he requested a substitution of counsel. Substitution was ordered on the following August 3.

On August 4, 1978, Sanchez filed a motion to create a subclass comprised of Mexican-American parents and their children residing in the attendance areas of schools sought to be closed by the District. Argument was heard on this motion on August 7. Also on August 7, Sanchez moved to continue the August 24th settlement hearing, and for additional time to present objections and alternatives to the District's desegregation plan. The settlement hearing was postponed to the following August 30, over the objections of the other parties, but no relief was granted on his request for additional time to object to the plan. That same day, August 7, Sanchez filed and served his first request for production of documents.

Hearings on the desegregation plan were held on August 8 and 9. The School District presented testimony in support of the plan. Due to the settlement, neither the

---

**2.** The District actually submitted several options, indicating the plan it preferred. The preferred plan "called for alteration of numerous student attendance zones, the closing of three old and small inner-city schools and altered transportation patterns for several hundred Anglo, Black and Mexican-American elementary and junior high school students." Brief of Appellee Tucson Unified School District No. 1, at 9 (footnote omitted).

class representatives nor the Government objected or chose to conduct cross-examination, but sought to reserve such opportunity should the settlement be disapproved by the Court. The District's witnesses were cross-examined by Sanchez, and he was given the opportunity to present evidence. Both Sanchez and Sutton, appellant in No. 79–3378, lodged their objections to the District's plan and presented alternatives. The Court then heard comments on the plan from members of the public.

Two days later, on August 11, the Court issued two orders. First, it approved the District's desegregation plans, finding that they were in compliance with the June 5th order—that they sufficiently remedied the violations found to exist in the nine schools. Second, the Court denied Sanchez's motion for certification of a subclass. It noted that the subclass's reason for existing, objection to the school closures, was mooted by the order approving the desegregation plans. And insofar as its objection reached the settlement itself, the settlement hearing under Rule 23(e) would protect objecting class members.

On August 14, 1978, the District Court approved the form of settlement notice to class members. Printed in both English and Spanish, it was published in Tucson's two daily newspapers.[3] In addition, copies of the notice were distributed to community groups, merchants and churches in the class members' neighborhoods. The notice contained a brief history of the litigation, a description of the Court's June 5, 1978 decision, a general summary of settlement terms, and a notice of the settlement hearing.

On August 16, Sanchez filed a motion for discovery in the form of production of documents and interrogatories. The motion was granted on August 22, except as to the issue of school closure, which had been deter-

mined in the August 11th order. Responses to the discovery were received on August 25 and August 29.

Just prior to the settlement hearing, the Fisher and Mendoza plaintiffs filed memoranda in support of the settlement, and Sanchez filed papers in opposition. The settlement hearing was conducted on August 30 and 31. The Court limited it at the outset to the question of whether the settlement was "fair, just, and adequate," and declined to entertain testimony on issues which had already been litigated and decided (e. g., school closures). Evidence was taken from the parties at the hearing, and individual class members were permitted to present testimony. At the close of the hearing on August 31, the Court approved the stipulated settlement.

Sanchez has appealed the order on August 11, the final order entered on August 31 approving the settlement, and several other post-August 1 rulings. Sanchez here questions the Court's refusal to certify a subclass, the form, content, and alleged lack of notice, the Court's rulings on discovery and scheduling of the proceedings, and the propriety of negotiating attorneys' fees along with substantive issues in the settlement of this litigation. Our jurisdiction to review these issues rests on 28 U.S.C. § 1291.

## II. NATURE OF THE ISSUES

The issues in this case center around its status as a class action school desegregation suit. Both its procedural context as a class action and its substantive context as a school desegregation suit shape our review and the resolution of the questions presented.

### A. Class Action

Although this case is substantively a school desegregation suit, the issues raised

---

**3.** The notice ran for seven days in one of the papers and for six in the other. On the first three days, in both papers, the announcement appeared in the fine print typical of legal no-

tices. On the remaining days, it was published in standard type and highlighted with a black border.

by Sanchez concern the procedural law of class actions. Sanchez does not object to the findings and conclusions in the Court's June 5th segregation decision, nor does he substantively challenge the Court's subsequent approval of the District's desegregation plan or approval of the settlement itself. Rather, Sanchez suggests that procedural infirmities surrounded the consideration and ratification of the plan and the settlement.

█ Representative suits carry with them an accepted structural risk that conflicts may arise between groups of class members. It may be unavoidable that some class members will always be happier with a given result than others, but potential injustice arises as the distribution of benefits and burdens in a class remedy becomes increasingly unequal. Although maximizing the overall gain is a valid pursuit in resolving a class action, a small minority of the class members may not be asked to bear an unduly disproportional share of the accompanying burdens. This possibility of inadequate accommodation of the interests of some or many of the class members, particularly absentee members, is a principal structural danger in class suits. *See In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106 (7th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1213–16 (5th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

Recognizing these inherent risks in class suits, the Rules of Civil Procedure attempt to counter them by imposing procedural requirements on the conduct of such actions. Fed.R.Civ.P. 23. *See Pettway* at 1214. In addition, courts have affirmed the special responsibility placed upon the trial judge to protect the rights of absentee class members, as well as those who are named plaintiffs. *E. g., Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th

Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Norman v. McKee,* 431 F.2d 769, 774 (9th Cir. 1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971). Overall fairness is the touchstone for evaluating the conduct and resolution of class actions, and the onus for this evaluation is vested in the trial court.

Class actions vary widely in their circumstances, and the procedural protections and judicial responsibilities are necessarily only generally defined. Broad discretion is granted to the trial judge, enabling him or her to respond fluidly to the varying needs of particular cases. Therefore, although certain factors must be considered and certain procedures complied with, much of the judicial oversight of class actions is in the form of the sound discretion of the District Court. *See Pettway,* 576 F.2d at 1214; *In re General Motors,* 594 F.2d at 1133. This will dictate our review of the District Court's actions.

Sanchez separately participated in this suit as one whose interests at the remedy stage of the litigation conflicted with those of other class representatives[4] and members of the class. As was apparent at the hearings on the desegregation plan and the settlement, at least some other class members share Sanchez's views. Most of Sanchez's complaints in this Court arise from the way the District Court accommodated Sanchez's participation as an objector in the remedy and settlement proceedings.

Thus, in examining the accommodation accorded Sanchez, we are for the most part reviewing the District Court's choices of how the required procedures were to be implemented. These are decisions within the general responsibility for judicial control and oversight of class actions, and accordingly are within the Court's broad discretion. Therefore, beyond assuring ourselves that Sanchez's constitutional due process rights were not violated, our standard of review for these choices is whether they reflect an abuse of discretion by the

---

4. Alberto Sanchez was one of the original named plaintiffs in the *Mendoza* action.

District Court, in light of the circumstances and posture of the case. This posture, *i. e.*, the stage of the proceedings and the questions being addressed, will in part be determined by substantive school desegregation law.

## B. *School Desegregation Context*

Many of Sanchez's complaints charging the District Court with failing to properly accommodate his objections to the school closures are grounded on a fundamental misunderstanding of the purpose of the plan hearing (August 8th and 9th) and the status of the school closure question following the August 11th order approving the desegregation plan. Sanchez's complaints that the school closure issue was not properly considered in the procedures surrounding the settlement hearing assume the continuing vitality of this issue after the August 11th order. What was and was not decided by the August 11th order, and what remained to be considered in the settlement proceedings, are determined by the law governing school desegregation remedies in the federal courts.

■ When a federal court finds that a public school system operates in a manner infringing upon some students' federal constitutional rights, the Court is empowered to prescribe a suitable remedy. *Keyes v. School District No. 1, Denver Colo.*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Wright v. Council of City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In the first instance, however, the Court must give the local school officials an opportunity to devise changes sufficient to bring the schools' operations within the constitutional standards. *Swann* at 16, 91 S.Ct. at 1276. *See Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). If the school officials present a plan which will correct the violations found, and it does not infringe upon other rights in the process, the District Court must approve that remedy even if the Court does not believe it was the most desirable plan which could have been selected.[5] *See Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

In the present case, the District Court in its June 5th decision found continuing constitutional violations at nine Tucson schools, and it ordered the School District to prepare a remedial plan. On July 17, 1978, following public hearings, the District filed with the Court several plans to correct the violations, designating the options it preferred. The Court held hearings on this plan August 8 and 9. On August 11, the Court issued an order finding the options acceptable remedies for implementation in September, 1978. This plan included involuntary busing of some students and the closing of three of the nine designated schools.

The hearing on August 8 and 9 was specifically and solely directed to the question of whether the District's desegregation plan remedied the constitutional violations found in the June 5th order, and whether it did so in a constitutional manner. The District Court's understanding of its role was consistent with the limited remedial jurisdiction of the federal courts in school desegregation cases. As the Court noted in its August 11th order:

> *v. Board of Commissioners*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The Court's responsibility to review and reject such thinly veiled forms of continued discrimination is at the very heart of its judicial function. But when the school district has submitted a plan which survives this searching inquiry, it must be accepted.

---

**5.** This does not, of course, in any way, diminish the District Court's obligation to carefully scrutinize a school district's proposal, to be sure that it does in fact satisfactorily correct the adjudged constitutional infirmities. Too often have remedies been proposed which merely perpetuate the segregative status quo. *See, e. g., Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Monroe*

"The remedy which this Court has authority to order must work, it must work now, and it must not inflict additional burden on plaintiffs and the classes they represent, nor inflict further racial or ethnic segregation or discrimination on such plaintiffs. This Court's jurisdiction or power does not extend any further than that. Concerning all other interests, parents and others must look to their elected officials.

\* \* \* \* \* \*

"At present, the Court must rule only on the issue of whether the defendants' proposed plans for the upcoming school year sufficiently remedy the violations heretofore found to exist with respect to nine schools."

The District Court went on to observe that the closing of the three schools was not required by its June 5th order, but that those closures were compatible with it. The Court's careful examination of the school closures determined that they would not place an undue burden on minority students. Finally, the District Court concluded that the proposed plans were "acceptable remedies for the constitutional violations heretofore found."

We believe the District Court properly perceived its role in reviewing the desegregation plan. The August 11th approval of the District's desegregation plan was an independent judgment of the District Court conclusively deciding the permissibility of the plan, including the school closures, for the 1978–79 school year. With this understanding of the status of the school closure issue as of August 11, we can proceed to examine the specific issues raised by Sanchez.

### III. SPECIFIC PROCEDURAL ISSUES

Sanchez argues that approvals of the desegregation plan and the class action settlement were done in violation of the objectors' procedural rights. We address his several assignments of error below.

### A. Timing

Sanchez first objects to the short period of time available to him to prepare for the plan hearing and the settlement hearing.

#### 1. The Plan Hearing

■ The timing of the plan hearing is one of the more troubling issues raised by Sanchez. He correctly points out that he was allowed very little time to prepare his objections to the plan. The desegregation plan was submitted on July 17, Sanchez requested substitution of counsel on July 27, and the hearing was held August 8 and 9. In addition to objecting to the plan, Sanchez was simultaneously advancing a subclass motion and preparing discovery requests.

We have no doubt that Sanchez received sufficient opportunity to be heard to satisfy constitutional due process requirements. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The closer question is whether the District Court abused its discretion in its scheduling of the remedy hearings, given its awareness that there were objections from within the class.

■ The fact that the action before the Court is a class suit imposes special responsibilities upon the trial judge. As noted above, representative suits carry with them inherent dangers of conflict and compromise of absentee interests. Accordingly, a Court overseeing a class suit must constantly be sensitive to conflicts within the class. See Note, Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1490 (1976) (judicial awareness of differences within a class as a protection of absentee interests). The Court must be well informed of the views of objectors, and serve as a guardian of absentee interests. Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832 (9th Cir. 1976); Greenfield v. Villager Industries, Inc., 483 F.2d 824, 832 (3d Cir. 1973). Cf. Norman v. McKee, 431 F.2d at 774 (context of Rule 23(e)).

However, the desegregation plan was not a settlement and was not bound by the more formal Rule 23(e) requirements. Fed. R.Civ.P. 23(e). With respect to the proposed plan, the District Court's responsibility was to assure itself that it had before it all relevant arguments, objections, and considerations concerning the plan. The extent, timing, and even existence of the plan hearing rested largely within the discretion of the trial court.

■ Review of a trial court's discretion must always be done in light of the circumstances of the case. *See Anderson v. Air West, Inc.*, 542 F.2d 522, 524 (9th Cir. 1976). In addition, we are not to substitute our ideas of fairness for those of the trial court in the absence of evidence that it acted arbitrarily, *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 771 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976), and such evidence must constitute a "clear showing" of abuse of discretion, *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1128 (9th Cir. 1977). Unless we find that the exercise of discretion was arbitrary and constituted plain error under the circumstances, we will not reverse. *See Bowles v. Quon*, 154 F.2d 72, 73 (9th Cir. 1946).

It is significant that the settlement and objections have come at the remedy stage of this litigation, and not during pretrial proceedings as do many class action settlements. Here, the District Court was particularly well informed about the action, having been intimately associated with it for over four years. This association included a full trial on the merits, familiarity with a voluminous amount of evidence, and a lengthy and detailed written decision. The Court was able to assess the relative merits and significance of a given argument or objection, and determine the amount of detail needed in the presentations. A further element properly in the Court's considera-tion was the desire to implement whatever plan was approved at the start of the next school year in September.

The District Court could also assess Sanchez's opportunity to prepare his objections to the plan. First, Sanchez had been involved in the case from its commencement as one of the original named plaintiffs in the *Mendoza* action, placing him in a different position than that of a passive, insulated class member. Second, Sanchez requested substitution of counsel on July 27, meaning that he and his attorney had at the minimum nearly two weeks in which to prepare their objections to the plan. Third, it was clear from the District Court's order establishing the August 8th hearing that it was not a settlement hearing, but rather focused only on the acceptability of the desegregation plan. As discussed above, this was limited to an examination of the adequacy of the District's plan in acceptably correcting the constitutional violations found in the Court's June 5th decision. There was nothing misleading in the Court's order, and Sanchez should have been aware of the narrow focus of the August 8th hearing. Given these considerations, the Court could properly decide that Sanchez could prepare a presentation for the hearing sufficient to inform the Court of potential constitutional problems the plan might contain for those who, due to a conflict of interests within the class, were not adequately represented by class counsel on the issue of school closure.

Thus, in light of these circumstances, we cannot say the District Court abused its discretion in not postponing the plan hearing.

## 2. *The Settlement Hearing*

■ Sanchez also contends that he was not afforded adequate time nor sufficient discovery to prepare for the August 30th settlement hearing. Initially we conclude that Sanchez's opportunity to be heard was not so limited or so nominal that it violated due process requirements. *See Mullane, supra.*

Our second inquiry is whether the District Court abused its discretion in not continuing the settlement hearing further into the future.[6] Fed.R.Civ.P. 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court . . . ." It further requires that notice of the settlement[7] be sent to class members, and though not mandatory, generally a hearing on the settlement is held.[8] *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976). *See Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). Notice and hearing are provided to assure that there are no unrepresented interests which are unfairly treated by the settlement. Absent class members are afforded an opportunity to come forward and make the Court aware of any undisclosed inadequacies. *See Norman v. McKee*, 431 F.2d at 774; *Pettway*, 576 F.2d at 1214-16. Particularly at the settlement stage, the Court must be keenly aware of its role as a "fiduciary [serving] as a guardian of the rights of absent class members." *Grunin*, 513 F.2d at 123.

The form which the Rule 23(e) procedural protections take is clearly left to the discretion of the trial court. Fed.R.Civ.P. 23(e). The Court must have before it sufficient information to assure itself that there were no procedural defects in the reaching of the settlement, and that the substantive terms of the settlement are fair and reasonable. *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); *Norman*, 431 F.2d at 774; *Grunin*, 513 F.2d at 123. Although the Court must be particularly sensitive to any sacrifice of minority interests,

there will generally have to be some compromise where, as here, the remedy sought is pervasive structural relief necessarily affecting all class members. The trial court must be able to determine if the balance struck is basically fair, looking to the benefits to be achieved by the class as a whole, as well as the distributive effects.

The question presented here is not whether the trial judge was correct in his substantive determination of fairness, but whether he abused his discretion in his scheduling of the settlement hearing. Because the purpose of a settlement hearing is to insure the opportunity for all relevant facts and objections to be placed before the Court, we must ask whether the trial court had sufficient facts before it to intelligently evaluate the settlement proposal. *Detroit v. Grinnell Corp.*, 495 F.2d at 462-63; *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). And in reviewing this question, we must accord great weight to the trial judge's views. He was close to the litigants and the case, was far more familiar with it than this Court, and in a superior position to perceive what needed to be known. *Cf. Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971).

Here, Sanchez had at the minimum nearly a month to prepare for the settlement hearing, and his discovery requests were granted[9] (except as to the issue of school closure which had been rendered moot by the Court's August 11th order).[10] Sanchez had been involved in the case from its inception, and there was a voluminous re-

---

**6.** The Court granted one request by Sanchez for a continuance, postponing the hearing date from August 24 to August 30.

**7.** Sanchez also contests the form of content of the notice given in this case. *See* section III-C, *infra*.

**8.** In school desegregation cases, however, hearings on proposed remedies are almost universally held, and it may well be an abuse of discretion not to conduct one.

**9.** Sanchez received his requested material on August 25 and 29. He could, however, have

chosen to use more expedient discovery procedures, or requested accelerated returns for his requests.

**10.** Sanchez suggests that denial of discovery on the issue of school closure was improper, and that there exist relevant and unsubmitted facts on this issue. However, as discussed above, the Court's August 11th order approving the desegregation plan properly affirmed its constitutionality and rendered further proceedings on the school closure issue moot. *See* section II-B, *supra*. We understand from Sanchez's brief that given this view of the Court's August 11th order, he concedes that the objectors

source of material already available. As it was, the District Court postponed the settlement hearing for one week on Sanchez's motion over the settling counsel's objection. Further, Sanchez has not demonstrated to this Court any relevant facts or objections which were not placed before the District Court.[11] In light of these circumstances, we believe that the District Court had sufficient information before it from all viewpoints to evaluate the fairness of the settlement. Moreover, it appears that no significant objections were suppressed by the District Court's decision to deny any further continuances of the settlement hearing. We find no abuse of discretion in the scheduling of the settlement hearing.[12]

**B.  *Request for Subclass Certification***

■ Sanchez moved for the certification of a subclass, with himself as class representative, to include those class members who would be directly affected by the school closure provisions of the desegregation plan.[13] The District Court denied this certification motion simultaneously with its approval of the plan, finding, *inter alia*, that there was no longer any need for a subclass formed to object to school closures because the issue was decided on the merits by the approval of the plan, and, furthermore, the subclass description was vague. We agree with the District Court that after the August 11th order, the need for the subclass disappeared.

■ Subclasses must meet the same requirements as a class. *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Just as the determination of class certification rests within the sound discretion of the trial court, *James v. Ball*,

---

would not be entitled to discovery on the school closure issue.

**11.** Sanchez argues that the desegregation plan was a part of the settlement, and thus should have been open to attack at the August 30th settlement hearing. To support his position, he points to the fact that the class attorneys did not object to the plan at the August 8–9 hearing, and that the plan was identified in the settlement. First, the substance of the plan was reached two weeks before the stipulation of settlement, and there is no evidence that the plan itself was a product of settlement negotiation. Second, even if it were the result of settlement negotiations, this would not necessarily preclude the District Court from independently assessing whether the plan conformed to the June 5th order. Ordinarily, some sort of adversary proceedings would be an important part of the process leading to a District Court's independent judgment. Here, however, the trial court judge was thoroughly familiar with the case. Moreover, there was in fact adversary presentation at the plan hearing by Sanchez and others. Finally, as discussed in the text (*see* section II–B, *supra* ), the Court ruled upon the question of the plan's constitutionality in its August 11th order. Consequently, it cannot be maintained that the merits of the plan itself remained an open question at the settlement hearing.

**12.** Sanchez relies heavily on *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), in arguing that the

presence of objectors to a settlement should have invoked more accommodation by the District Court. Such reliance is misplaced. In *Pettway*, there was a far more pervasive class rejection of a proposed settlement which led the Fifth Circuit panel to believe the trial court had abused its discretion in approving the Title VII class action settlement. There, each of the active class representatives objected to the settlement, the elected members of a workers' committee actively overseeing the litigation rejected it, and at least 70 percent of the class (and perhaps more) opposed the settlement. *Id.* at 1214 & n. 70. While we do not suggest that the quantity of objectors will determine whether a settlement proposal should be rejected, that factor, among many other factual distinctions, renders *Pettway* a poor factual analogue to this case. We do, however, find our holding here to be consistent with the general standards of class action law discussed and applied in *Pettway*.

**13.** The proposed subclass was described as follows:

"[A]ll Mexican-American or Hispano-American students or students with Spanish Surnames within grades K through 8 in Tucson School District Number One, and the parents, guardians and/or next friends of those students, who now attend or will in the future attend a school subject to or proposed to be, immediately or in the future, closed by order of this Court or proposed settlement by the parties."

613 F.2d 180, 186 (9th Cir. 1979); *Montgomery v. Rumsfeld*, 572 F.2d 250, 255 (9th Cir. 1978), so, too, does the determination of the need for a subclass. It is appropriate to invoke subclassification when there are or may be divergent views among class members and when the Court believes that subclasses would materially improve the presentation of all relevant considerations.

Sanchez's arguments that the District Court erred in denying his motion for subclass certification stem principally from his misunderstanding of the Court's August 11th order. As discussed in section II–B above, the August 11th order finally decided on the merits the question of whether the schools sought to be closed by the School District would in fact be closed. Thereafter, the role that the school closures were to play in the settlement hearing became second order: Their existence could be considered in terms of the overall fairness of the settlement, but the fact of the closures themselves were no longer open to objection. Thus, the substantive question of whether those three schools would or could be closed was not, contrary to Sanchez's argument, present at the settlement hearing.

The foreclosure of this issue from the settlement strikes at the heart of the subclassification motion. The need for the subclass was premised upon the desire to prevent the schools from being closed, a desire apparently shared by a significant number of parents whose children attended those schools. However, it is not at all clear where the proposed subclass stood on the overall fairness of the settlement, given as irrevocable the decision to close the schools under the District's plan. Nor is it clear that their views on this question differ from the interests of the class as a whole. Finally, it does not appear that the District Court was deprived of any material viewpoints, objections, or information for want of a subclass at the settlement hearing.

For the foregoing reasons, we find no abuse of discretion in the District Court's denial of Sanchez's subclass motion.

## C. *Notice*

Sanchez objects to both the form and the content of the settlement notice.[14] He contends that the failure to mail individual notice to class members was a violation of due process. He asserts the same complaint about the tardiness and form of the newspaper notice. With respect to content, Sanchez notes that the notice did not (1) advise that counts 2, 3, 5 and 6 of the Mexican-American complaint would be dismissed with prejudice; (2) name the specific schools to be closed under the approved desegregation plan; or (3) reveal any formula for division of attorneys' fees among the class attorneys. He claims that these omissions rendered the notice defective.

Rule 23(e)[15] requires that notice to the class be given of any proposed class action settlement.[16] Although the rule ac-

---

14. Sanchez also argues that notice was required before the August 8th and 9th hearings on the desegregation plan. He contends that because the plan ultimately became a part of the settlement proposal, the plan hearings became *de facto* settlement hearings, requiring all the commensurate procedural formalities, including notice. Because we reject this view of the August 8th and 9th hearings, *see* section II–B, *supra*, we also reject any claims that notice to the class was required prior thereto.

15. Fed.R.Civ.P. 23(e) provides:
    "(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

16. Appellees suggest that notice may not have been required here at all, inasmuch as the action had already gone to judgment on the merits. We disagree. In many 23(b)(2) class actions, and in school desegregation cases in particular, there are significant issues which remain after judgment which do not lend themselves to simple and straightforward resolution. The broad scope of potential injunctive relief and the variety of remedies available raise the possibility that interests may be compromised. The procedural protections attached to the ini-

cords a wide discretion to the District Court as to the form and content of the notice, due process requires its presence and constitutional adequacy. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 172–77, 94 S.Ct. 2140, 2150–52, 40 L.Ed.2d 732 (1974); *Grunin*, 513 F.2d at 121. To meet this standard, the notice given must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657. Further, in applying Rule 23(e), this Court has noted that it reasonably demands that notice be given "in a form and manner that does not systematically leave an identifiable group without notice." *Mandujano*, 541 F.2d at 835.

1. *Form*

■ The notice of settlement approved by the District Court was published 13 times in a seven day period in the two major Tucson newspapers,[17] beginning eight days before the August 30th and 31st settlement hearing. The notice was printed in both English and Spanish, and copies were provided to the local broadcast media, and were distributed to numerous locations throughout the minority community which are frequented by large numbers of class members.[18] Further, the trial court observed in its notice order that there was a "great amount of local publicity concerning all prior orders and proceedings." All members of the class necessarily lived within Tucson School District No. 1, an area served by the newspapers carrying the notice, and were subject to all of the additional publicity generated by the suit.

■ We believe this form of notice was reasonably calculated to reach the members of the class. A party's capability to provide individual notice does not make such notice mandatory when notice by publication will suffice. In a class action seeking a structural injunction, notice is intended to encourage those with divergent views to come forth, helping the trial court to identify possible inadequacies in the settlement. In general, in such cases seeking a structural remedy, publication notice sufficiently accomplishes this major purpose. *See Developments, supra*, at 1566. Here, in particular, there was widespread actual notice of the settlement and the hearing as a result of the published notice and other sources, and a number of class members did in fact come forward to object. It being reasonably concluded that this form of notice would be effective, and with the subsequent indications that it did in fact reach large numbers of the class, we find no abuse of discretion or violation of due process in the form of notice provided here.

2. *Content*

■ Nor do we find any infirmity in the content of the notice provided. Notice in a class suit may consist of a very general description of the proposed settlement. *Grunin*, 513 F.2d at 122. It "must present a fair recital of the subject matter and proposed terms." *Holiday Magic, Inc.*, 550 F.2d at 1177. Here, the specific omissions which Sanchez notes are not fatal to the document.

■ The content of this notice provides a fair and general summary of the settlement. It first identified the members of the class to whom it was directed, briefly mentioned the background of the case, described the Court's June 5th desegregation order, and identified the nine schools requiring desegregation. The notice then

tial action should also be considered applicable to the remedy phase in such circumstances, at least as a matter of proper class action administration.

**17.** *See* note 3, *supra.*

**18.** Copies of the notices were delivered to many local merchants, churches, community centers, etc.

went on to describe the proposed settlement. It cited the options under which the nine schools would be operated; identified the additional three schools which would have assignment patterns altered; identified additional schools whose assignments would be studied; mentioned additional procedural points of the settlement; and disclosed that a $500,000 attorneys' fee (including costs) had been agreed upon and incorporated. The notice also informed the reader where a copy of the stipulation of settlement and the desegregation plan could be obtained, announced the time and place of the settlement hearing, and concluded by inviting any class member to file written objections or to appear and be heard by the Court.

Sanchez relies on *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, in arguing that the failure to disclose the division of the agreed-upon attorneys' fees rendered notice defective. We do not find this case factually analogous to *General Motors*. The *General Motors* case was procedurally complex—many class actions had been consolidated, the Attorneys General of most states were participating as well as private attorneys, and only a small committee conducted the settlement negotiations, perhaps without authority to do so. We do not believe that the same potential for abuse and undue influence existed here. Moreover, the total amount of fees to be paid here was disclosed, and only two sets of attorneys were to participate in its division. While disclosure as to apportionment of the negotiated attorneys' fees may have been desirable, we cannot say it was an abuse of discretion to approve the settlement notice without such a provision.

Sanchez further objects to the notice because it does not specify that three schools will be closed under the desegregation plan. The notice merely states that these schools "will be operated . . . in accordance with [certain options] of the plans sub-

mitted to the court on July 17, 1978." Again, this argument loses force when the school closure question is viewed in proper perspective. If the merits of school closure were subject to debate at the settlement hearings, this omission might well be fatal. However, because the school closures only assumed a subordinate role at this hearing, they could be described in the same general terms applicable to other portions of the settlement notice. The notice generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard. We find the content of the settlement notice to be adequate.

### D. *Attorneys' Fees*

■ Finally, Sanchez complains that the simultaneous negotiation of attorneys' fees and substantive issues in the settlement discussions was improper. He describes possible trade-offs between additional benefits to the class and attorneys' fees, and argues that these are improprieties which should weigh toward reversal.

Although we find the scenarios offered by Sanchez to be no more than suggestive of mere potential conflicts, we cannot endorse the procedure used here to reach agreement on attorneys' fees. Negotiation is necessarily a give and take process, and all active elements are weighted in the balance. We cannot indiscriminately assume, without more, that the amount of fees have no influence on the ultimate settlement obtained for the class when, along with the substantive remedy issues, it is an active element of negotiation. *See Prandini v. National Tea Co.*, 557 F.2d 1015, 1021 (3d Cir. 1977). Nor do we believe that this potential conflict disappears simply because there is no fund or money damages being negotiated. Financial consequences of injunctive relief are a significant consideration to the institution negotiating a remedy, and the potential conflict [19] between class

---

**19.** We do acknowledge, however, that the danger of impropriety may not be as great here as

when there is one fund from which both the class award and the attorneys' fees are to be

counsel and the members of the class remains.[20]

■ Whether the existence of this potential conflict requires a trial court to reject a settlement proposal depends upon the circumstances of each case. The presence of simultaneously negotiated attorneys' fees should cause the court to examine with special scrutiny the benefits negotiated for the class. It would rarely be an abuse of discretion for a trial court to reject a settlement proposal where such combined negotiation took place. But rejection of a settlement is not automatically required in such cases—there may be circumstances present which appear to neutralize the potential for impropriety. Such a judgment is appropriately within the sound discretion of the trial judge who can be sensitive to the dynamics of the situation. Thus, while we strongly discourage the simultaneous negotiation of attorneys' fees and substantive issues in class action settlement negotiations, *accord, Prandini,* 557 F.2d at 1021, we do not believe rejection of a resulting settlement in every case is appropriate.

This case, while presenting the evil of simultaneously negotiated attorney fees, also contains such neutralizing elements. The United States Department of Justice has been an active participant in this case on the side of the plaintiff class since before the trial on the merits. It participated in the negotiations leading to settlement, and placed its imprimatur on the ultimate proposal. The participation of a government agency in such proceedings serves to protect the interests of the class against possible improper dealings. Its concurrence in the approval of a settlement is properly an element for the Court to consider. *Holiday Magic, Inc.,* 550 F.2d at 1178. *See Developments, supra,* at 1563. We believe this par-

ticipation to be a significant factor in quieting the potential for unfair treatment of minority interests within the plaintiffs' class. While the Justice Department's involvement is not determinative of any issue, it weighs favorably in issues focusing on potential unfairness to absentee interests. Further, we believe it to be of some mitigating value that there was statutory authorization for an award of attorneys' fees to plaintiffs. *See* 20 U.S.C. § 3204 (formerly 20 U.S.C. § 1617). Again, while this is not determinative, and not a justification for class action parties to engage in simultaneous negotiation in the future, we believe it is a mitigating factor properly considered in this case. Under these circumstances, we do not believe that the trial judge abused his discretion in approving the settlement.

## CONCLUSION

Sanchez has raised issues concerning the conduct of the class action proceedings in this school desegregation suit. Generally, we believe Sanchez has misunderstood the nature of the District Court's approval of the desegregation plan, as it related to the issues of school closures. Specifically, as discussed above, we find no due process violations or abuse of discretion in the trial court's decisions on timing, discovery, subclass certification, notice, or settlement approval in light of the attorneys' fees negotiations. All other contentions raised by Sanchez have been considered and found to be meritless. The District Court orders appealed from are affirmed.

AFFIRMED.

---

apportioned. In such a case, where the defendant is indifferent as to the allocation, the conflict is more direct. These are appropriate circumstances for the District Court to take into account. *See* text following note 18, *infra. Cf. Shlensky v. Dorsey,* 574 F.2d 131, 150 (3d Cir. 1978) (simultaneous negotiation permitted in shareholders' derivative suit because defendant had interest in maximizing class recovery).

**20.** We do not make any findings that there were in fact improprieties in the negotiation of this settlement. However, "[t]he court does have the duty to see to it that the administration of justice has the appearance of propriety as well as being so in fact." *Prandini v. National Tea Co.,* 557 F.2d 1015, 1021 (3d Cir. 1977).